Paul W. Kisslinger
*kisslingerp@sec.gov*
(202) 551-4427
Kevin C. Lombardi
*lombardik@sec.gov*
(202) 551-8753
Patrick R. Costello
*costellop@sec.gov*
(202) 551-3982

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549
Facsimile:  (202) 772-9292

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ERIK K. BARDMAN, | |
| and | **DEMAND FOR JURY TRIAL** |
| JENNIFER F. WOLF | |
| Defendants. | |

The Securities and Exchange Commission ("Commission") alleges as follows for its Complaint against defendants Erik K. Bardman ("Bardman") and Jennifer F. Wolf ("Wolf"):

## SUMMARY OF ALLEGATIONS

1.       At all relevant times, Bardman and Wolf were, respectively, the Senior Vice President of Finance and Chief Financial Officer (CFO), and Acting Controller of Logitech

International, S.A. ("Logitech"), a manufacturer of computer accessories and other electronic equipment. In October 2010, Logitech launched a product called "Revue," a set-top device that connected to televisions to provide internet usage and video streaming. Revue was projected to be a significant percentage of Logitech's sales revenue, and represented a new strategic direction for the company – but the product failed to live up to expectations. Its sales were 70 percent lower than internal projections by the fourth quarter of the 2011 fiscal year. Compounding the poor sales performance of Revue, in March 2011, Logitech lowered its forecast of operating income to $140-150 million, causing an immediate 16 percent drop in the company's share price. Given the shortfall, senior management, including Bardman and Wolf, were under substantial pressure to meet the lowered guidance. Rather than ensure that Logitech accurately account for its problems, as they were required to do, Bardman and Wolf engaged in a scheme to materially inflate the operating income that Logitech reported to its investors in a late April 2011 earnings release, and in its annual report, or Form 10-K, filed with the Commission on May 27, 2011 for the fiscal year ended March 31, 2011.

2. By this time, Logitech had 163,000 units of Revue in storage in the United States that the company had not sold, and it had halted production of additional units in light of the poor sales performance. Logitech's current price for the product – $299 – was more than double the price of competing products and part of the reason Revue was not selling. Indeed, by at least May 19, 2011, Bardman knew that Logitech's Chief Executive Officer had been evaluating whether to "shut [Revue] down now."

3. Through their scheme, Bardman and Wolf concealed the extent of these problems by, among other forms of misconduct: (1) improperly calculating Revue's inventory valuation reserves by falsely assuming that Logitech would build excess component parts it was trying to sell into finished units of Revue; (2) misrepresenting to Logitech's independent auditor that the Company's excess component parts would be used in production, and the company's future plans for Revue; and (3) misrepresenting to the independent auditor the proper amount of Logitech's write-down of finished goods inventory by failing to incorporate probable future

SEC v. Bardman, *et al.*
Complaint

pricing adjustments.  As a result of this misconduct, Logitech overstated its fiscal 2011 operating income by $30.7 million (over 27%).

4.     In addition, in a letter to Logitech's independent auditors dated May 27, 2011, Bardman and Wolf falsely represented that Logitech's accounting was compliant with Generally Accepted Accounting Principles, or "GAAP."  These representations, demanded by, and relied upon by Logitech's independent auditors, were designed to ensure that the company's accounting was done in accord with accepted standards and did not mislead the investing public. Here, Bardman misled the company's independent auditors regarding the extent of Logitech's problems with Revue.  He then signed and certified the accuracy of Logitech's 2011 financial statements, thereby misleading investors as to these same misstatements and omissions.  At the time, Bardman knew, was reckless in not knowing, or should have known, that the financial statements he was certifying were materially false or misleading.

5.     By engaging in the conduct described herein:

    a.  Bardman and Wolf violated the antifraud provisions of Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

    b.  Bardman and Wolf violated the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; and the lying to accountants provision of Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2];

    c.  Bardman violated the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and the clawback provision of Section 304(a) of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") [15 U.S.C. § 7243(a)]; and

d.   Bardman and Wolf aided and abetted Logitech's violations of the antifraud, reporting, books and records, and internal controls provisions of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78m(b)(2)(A)-(B)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-11 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-11].

6.   The Commission seeks injunctive relief, including an officer and director bar, disgorgement of ill-gotten gains, prejudgment interest, civil penalties and other appropriate and necessary equitable relief from Bardman and Wolf.  In addition, the Commission seeks an order requiring Bardman to forfeit any bonus, incentive-based compensation, or stock sales profits received during the relevant period.

**JURISDICTION AND VENUE**

7.   This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

8.   Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts and omissions constituting violations alleged herein occurred in this judicial district.

9.   Intradistrict Assignment.  Assignment to the San Francisco Division is appropriate pursuant to Civil L.R. 3-2(c) and (e) because a substantial part of the events or omissions giving rise to the Commission's claims occurred in the County of Alameda.

10.   Bardman and Wolf, directly and indirectly, made use of the mails and of the means or instrumentalities of interstate commerce in connection with the acts, practices, and courses of business described in this Complaint.

SEC v. Bardman, *et al.*
Complaint

**DEFENDANTS**

11.     Erik K. Bardman, age 49, is a resident of Los Altos, California.  From October 2009 through April 2013, he was Logitech's Senior Vice President of Finance and Chief Financial Officer.

12.     Jennifer F. Wolf, age 51, is a resident of Campbell, California.  She was employed at Logitech from August 2001 through April 2012.  From May 2010 through July 2011, Wolf was Logitech's Acting Controller.  From July 2011 until she left Logitech in April 2012, Wolf was a director of finance.  Wolf is and, at all relevant times, was a certified public accountant, licensed in California.

**RELEVANT ENTITY**

13.     Logitech International, S.A. ("Logitech") was incorporated in Switzerland and has substantial operations in the United States.  Logitech manufactures and sells peripherals for computers and electronic devices.  At all relevant times, Logitech's shares were listed and traded on the Nasdaq Global Select Market under the symbol LOGI and on the SIX Swiss Exchange under the symbol LOGN.  The company maintains an executive office and its Americas region headquarters in Newark, Alameda County, California.  Logitech's common stock is registered with the Commission pursuant to Exchange Act Section 12(b).

**FACTS**

*Background*

14.     In October 2010, during Logitech's third quarter of fiscal 2011, Logitech launched a product called "Revue" (also known internally as "Ka"), a set-top device that connected to televisions to provide internet usage and video streaming.

15.     From the outset, Revue sales were significantly below internal forecasts.  The company's projections in October 2010 were for sales of more than 350,000 units in the third and fourth quarters.  In fact, the company sold approximately 165,000 units by the end of the fourth quarter, falling short of its own projections by more than 50 percent.

16.     By late November 2010, sales and finance personnel, including senior executives, discussed whether the Company should reduce the market price of $299.  Bardman and Wolf were aware that Logitech would have to record a "lower of cost or market" ("LCM") charge if the value of Revue inventory were less than its market value.  In other words, under GAAP, a company must value its inventory at the lower of the inventory's cost or its replacement or market value.  Specifically, if the market value of a company's inventory is likely to be less than the total cost of manufacturing, shipping, bringing to market, and selling the inventory, then the company must write-down the inventory value in its financial statements to reflect that lower number.

17.     Prior to launching Revue, Logitech had retained a contract manufacturer ("CM") in Asia to produce hundreds of thousands of Revue units in anticipation of demand during the year-end holidays.  Logitech had also authorized the CM to purchase millions of dollars of components to meet expected demand.  Logitech recorded the Revue units and components as inventory within its financial statements.  As a result, these items were reflected as assets from which Logitech could derive future sales.

18.     On or about December 7, 2010, because of high inventory levels and weak sales, Logitech directed CM to stop manufacturing Revue, including halting all work-in-progress.  Logitech also instructed CM not to ship over 26,000 finished Revue units.  By this time, CM, at Logitech's direction, had purchased or committed to purchase approximately $11 million of component parts for future manufacturing, which were now excess components.

19.     On or about January 5, 2011, Logitech's Senior Vice-President of Operations (SVP-Operations) informed several executives that a decision had to be made about the Revue excess component parts: "Given the current trajectory, I suggest we make all efforts to dispose of the components."  Shortly thereafter, the SVP-Operations instructed the VP of Global Sourcing/Supplier Management (VP-Global Sourcing) to "sell all of the components we could."

20.     In the first half of January 2011, Logitech management informed the Board of Directors about the poor sales of Revue and about management's future plans for the product,

SEC v. Bardman, *et al.*
Complaint

including a plan to lower the retail price to $249 in the first quarter of fiscal year 2012 and to $199 in the third quarter of fiscal year 2012.

21.     On January 27, 2011, Logitech issued its earnings release for the third quarter of 2011, reporting strong results, increasing its guidance for 2011 annual revenue, and affirming its guidance for annual operating income in a range of $170 million – $180 million.

22.     On or before February 8, 2011, Bardman and Wolf knew, were reckless in not knowing, or should have known, that sales for Revue were well below expectations, that the components in inventory were excess, and that a disposition plan had been developed for Revue inventory.

23.     During the fourth quarter of Logitech's fiscal year 2011, Revue sales continued to fall far below projections.  Despite regular discounting and promotions, Revue retail sales were 70% lower than internal product forecasts.  By quarter-end, retailers were selling fewer than 1,000 Revue units per week, when projections were more than twice that amount.

24.     On or about March 21, 2011, Bardman informed the CEO that Logitech could avoid a charge by delaying or not making a decision about cutting the price of Revue. Specifically, Bardman provided a summary of Revue inventory exposure to the former CEO, and wrote:

> Obviously, these numbers can move around as it [sic] relates to levels of sell through between now and any firm decisions and we also have the option of continuing to run promos on the product and take the "hit" over time.  My suggestion is that we use the Ops review discussions to make a firm decision on what we definitely want to decide between now and when we file the 10K at the end of May.  Any firm decisions we make to lower price or to definitely not make a V2 before the end of May would pull some of this impact into Q4.

25.     As an experienced CFO, Bardman knew, was reckless in not knowing, or should have known that GAAP does not allow management to decide when it will take a charge – or to delay making a "decision . . . to decide" to achieve an accounting result.

26.     At the end of the fourth quarter for fiscal year 2011, Logitech had over 163,000 units of Revue finished goods inventory in its U.S. distribution centers and another 52,000 finished and work-in-progress units in Asia.  Based on the sales rate for the fourth quarter, Logitech had well over a year's supply of Revue.  At the quarter-end sales rate to retailers, Logitech had over three years of inventory.

27.     In mid-March 2011, a Regional Finance accountant asked the VP-Global Sourcing about financial risk for the Revue product and the number of units that could be built from on-hand components.  The VP-Global Sourcing was responsible for purchasing all components and materials used, and to be used, in production of the Revue product.  He informed the Regional Finance accountant that there was no plan to use the components and that Global Sourcing was attempting to sell whatever could be sold.  He also noted: "If we need to scrap [work-in-progress] and components, we should assume a recoverable value of zero."  This message was forwarded to Bardman and Wolf by at least mid-April 2011.

28.     On or about March 23, 2011, a Logitech Finance employee sent Wolf a summary of potential excess and obsolete inventory for contract manufacturers in preparation for a meeting to discuss accounting adjustments for the fiscal year-end financial statements.  The summary highlighted a total potential excess inventory of $19.4 million for Revue units and components that "should be reserved."

29.     On March 31, 2011, Logitech announced that, for reasons unrelated to Revue, it would miss the guidance it had provided to the market two months earlier.  Logitech lowered the previous guidance for operating income by $30 million (to a range of $140 million – $150 million).  Logitech's stock price dropped by approximately 16 percent in response to this revised forecast.  Internally, Logitech's then-CEO characterized the guidance miss as a "disaster" and informed Bardman and other senior executives that management had lost its credibility with the market.

*Intentionally and Improperly Understating the Revue Inventory Write-down*

30.     Internally, Logitech's finance and accounting groups used a quarterly "exposure list" to keep track of accounting issues, including potential exposures or charges.  Bardman and Wolf met regularly to discuss the matters on the exposure list.  In April 2011, the exposure list included millions of dollars of "potential exposure" related to Revue.  Bardman and Wolf did not provide the exposure list to Logitech's independent auditor nor discuss with the auditor the potential exposure for Revue.

31.     In April 2011, during its fiscal year 2011 year-end financial close process, Logitech initially prepared an analysis indicating that no LCM charge was required for Revue finished goods inventory.  In contrast to Logitech's decision to discontinue production of Revue, and to sell off its components, the April 2011 analysis failed to accurately address the value of the component inventory.  The audit team did not believe the analysis to be reasonable and spoke separately with Bardman and Wolf to discuss the importance of the assumptions in the analysis.

32.     On or about April 13, 2011, the audit team met with Bardman and Wolf.  They told Bardman and Wolf that their LCM analysis must consider management's plans for future pricing.

33.     Bardman and Wolf were aware at the time that the company was required to write down the value of its Revue inventory.  Indeed, on or about April 13, 2011, Wolf emailed an "exposure list" to Bardman.  Under "potential exposure areas," the list included a $2.2 million "[e]stimated LCM adjustment" for finished Revue units and a $10.8 million "[e]stimated inventory exposure with suppliers" for Revue component parts.  The list also included a $1.4 million potential Revue exposure "for second price drop."  The $10.8 million estimated inventory exposure and the $1.4 million exposure for a second price drop related to issues that had not yet been discussed with or flagged for Logitech's independent auditors.

34.     On or about April 14, 2011, Logitech sent a revised LCM analysis to the independent auditor.  Based on the first planned price cut to $249, which was scheduled for the first quarter of the 2012 fiscal year, the LCM analysis indicated a $2.2 million reserve.

However, the revised analysis did not account for the second planned price cut to $199, which was scheduled for the third quarter of 2012, nor did it include any write-down of the value of the excess component parts.  In other words, Bardman and Wolf were not flagging items from the exposure list for the consideration of Logitech's independent auditors even though they had created or received the exposure list only one day earlier.

35.     After receiving the revised LCM analysis with the $2.2 million reserve, an audit team member noted the roughly $11 million of excess component parts inventory and informed Wolf and Regional Finance that Logitech was also required to evaluate and, if necessary, to record a write-down of that inventory.

36.     Logitech's Regional Finance accountant contacted Wolf regarding the $11 million excess components inventory.  The Regional Finance accountant then emailed the VP-Global Sourcing, notifying him there was "heated discussion" with the independent auditor about Revue and asking him to determine the number of Revue units that could be built from the component inventory.

37.     On April 17, 2011, the VP-Global Sourcing, informed the Regional Finance accountant and Wolf that production of Revue had been stopped for months, and that "[a]s for components, I don't see a chance that we are ever going to build them into units, this is a far fetched scenario that has never been formulated."  He also explained that, at the direction of the SVP-Operations, "we have been working since January to resell component liabilities" with only "modest" progress.  He stated that "the easiest stuff to resell . . . is moving at 40-50cts on the dollar *maximum*.  For the rest of [the] components, we should assume 25cts on the dollar of recovery, the rest will be a hard loss."

38.     Also on April 17, 2011, Wolf forwarded the email chain to Bardman, who asked about the potential exposure for Revue inventory if the VP-Global Souring was correct.  In reply, Wolf set forth a rough estimate of the exposure if Logitech were (i) to write-down the value of the component parts to 40-50 cents on the dollar and (ii) to assume that the excess components would be built into finished goods.  Wolf stated that the Company would save several million

SEC v. Bardman, *et al.*
Complaint

1  dollars by not writing down the component parts.  Wolf had no reasonable basis for assuming

2  that the component parts would be built into finished goods.  In fact, the most expensive of the

3  components, chips manufactured by Intel, could not feasibly be used in other products, as they

4  were specifically programmed for Revue.

5       39.    In a reply on the same day, Bardman emailed: "Yes, we need to understand with

6  precision what we are looking at and what decisions we need to make or clarify.  We are still

7  committed to making the right decisions and staying within our lowered range for Q4—we need

8  to achieve them both."

9  ***Bardman and Wolf Lied to the Auditors in Furtherance of the Scheme***

10      40.    On April 18, 2011 (the day after her emails with Bardman), Wolf received a

11  detailed list of Revue excess component parts.  Less than an hour later, Wolf sent a spreadsheet

12  containing an LCM analysis of these parts to the independent auditor.  The spreadsheet

13  calculated a write-down of $1.1 million, based on a hypothetical (and "far fetched") build-out of

14  79,000 additional Revue units.  Wolf did not disclose that, as had been communicated to her two

15  days earlier, Logitech had been actively attempting to sell all of the components for months, with

16  only limited success and at prices substantially below cost.  Thus, the spreadsheet falsely

17  indicated that the remaining $10 million in excess components did not need to be written down.

18      41.    Shortly after forwarding the LCM analysis for the component parts to the

19  independent auditor, Wolf met with members of the audit team.  At that meeting, Wolf discussed

20  Logitech's plans to use the excess component parts to build 79,000 finished Revue units.  She

21  also represented that Logitech could use the excess component parts (beyond what was needed to

22  make 79,000 Revue units) to manufacture additional Revue units.  In addition, because the CM

23  would need to purchase certain components to manufacture the 79,000 finished units, Wolf

24  informed the audit team that CM was expected to purchase those components.  In fact, Logitech

25  had no plans to manufacture 79,000 additional Revue units, to purchase additional components

26  for the manufacture of 79,000 additional units, or to manufacture any additional units beyond the

27

SEC v. Bardman, *et al.*
Complaint

79,000 stated in the LCM analysis.  Therefore, Wolf's representations were false, and she knew, was reckless in not knowing, or should have known that they were false.

42.     During the week of April 18, 2011, Bardman and Wolf met with senior members of the independent audit team.  In those meetings, Bardman and Wolf confirmed the false assumptions used in the LCM analyses.  Bardman and Wolf also inaccurately confirmed that Logitech planned to build at least 79,000 additional units using excess component parts.  In fact, Logitech had no such plans, and the representations of Bardman and Wolf were false, and they knew, were reckless in not knowing, or should have known, that they were false.

43.     Bardman and Wolf knew, were reckless in not knowing, or should have known, that Logitech had no production plan to manufacture additional units of Revue.  They knew, were reckless in not knowing, or should have known, that CM had not shipped any Revue units since late November 2010 and had stopped production in early December 2010.  Moreover, Bardman and Wolf knew, were reckless in not knowing, or should have known, that Logitech had no timetable for resuming production or for completing the work-in-progress units, and, for months, had been attempting to sell excess component parts at substantial discounts.  Bardman and Wolf did not disclose this information to the auditors, even though they knew, were reckless in not knowing, or should have known that failure to make such disclosure could result in rendering Logitech's financial statements materially misleading.

44.     Among other internal accounting controls, Logitech had an internal sub-certification process in which dozens of employees were required to respond to questions and statements and to provide relevant comments.  As part of that process, the VP-Global Sourcing raised concerns about Revue-related exposure.  In responding to a question about whether inventories were appropriately stated at the lower of cost or market value, he wrote: "I do not have visibility on the final decisions made on provisions for [Revue] potential excess inventory, and whether I consider them reasonable."

45.     On or about May 10, 2011, Wolf received the employee comments from the sub-certification process, including the VP-Global Sourcing's comments about Revue-related

1  exposure.  As Acting Controller, Wolf failed to adequately evaluate the concern raised (again) by

2  the VP-Global Sourcing about Revue-related exposure and did not inform the independent

3  auditor about the concern.  As a result, the control failed.

4  ***Misrepresentations to the Auditors in the Management Representation Letter***

5  46.    In connection with the annual audit of Logitech's financial statements, the

6  independent audit team required Bardman and Wolf to sign a management representation letter.

7  Among other representations, the letter contained statements concerning the valuation of

8  Logitech's inventory.  During preparation of the letters, the audit team told Bardman and Wolf to

9  consider future pricing within Logitech's LCM analysis.

10  47.    On or about May 27, 2011, Bardman and Wolf signed the management

11  representation letter and sent it to the audit team.  In the letter, Bardman and Wolf falsely

12  represented, among other things, that (i) they believed the financial statements conformed with

13  GAAP; (ii) there were no material transactions, agreements, or accounts that had not been

14  properly recorded in the company's accounting records; (iii) the Company had no plans or

15  intentions that might materially affect the carrying value of assets and liabilities; (iv) inventories

16  were stated at the lower of cost or market; and (v) they "considered future pricing

17  adjustments/discounts which are probable of occurring."

18  48.    Bardman and Wolf knew, were reckless in not knowing, or should have known

19  that their representations in the management representation letter were false or misleading.

20  Specifically, Bardman and Wolf knew, were reckless in not knowing, or should have known that

21  (i) GAAP would not allow the Company to value its inventory based upon a hypothetical plan to

22  manufacture 79,000 units, when in fact no such plan existed and when in fact Logitech was

23  trying to sell or dispose of the assets below cost; (ii) Logitech had not properly recorded the

24  Revue-related inventory; (iii) the Company's intentions to reduce the price of Revue and to sell

25  or dispose of the components might materially affect the carrying value of Revue-related

26  inventory; (iv) the Revue-related inventory was not stated at the lower of cost or market; and

27

SEC v. Bardman, *et al.*
Complaint

1  (v) they had not considered all probable future pricing and discounts, specifically, the second

2  planned price cut, in the LCM analysis.

3      49.     On May 27, 2011, Logitech filed with the Commission its annual report on

4  Form 10-K for the 2011 fiscal year, which Bardman signed and which contained the Company's

5  financial statements and the audit report of its independent public accountants.  Logitech

6  reported operating income of $142.7 million, which was within the lowered range of

7  $140 million – $150 million that Logitech had communicated to investors on March 31, 2011.

8  ***Misrepresentations to the Investing Public***

9      50.    On April 27, 2011, Logitech issued a press release concerning its financial results

10  for the fiscal year that ended March 31, 2011.  Bardman's and Wolf's actions, as described

11  above, resulted in Logitech's making material misrepresentations in that press release about the

12  Company's operating income and net income.  Specifically, those amounts were materially

13  overstated because the Company did not properly value its Revue finished goods inventory or

14  component parts inventory.  On April 28, 2011, Logitech filed a Form 8-K concerning the press

15  release, which was furnished to the Commission.

16      51.    Bardman's and Wolf's actions, as described above, resulted in Logitech's making

17  material misrepresentations in its May 27, 2011 Form 10-K for fiscal 2011 about the Company's

18  operating income and net income.  Specifically, Logitech overstated operating income by

19  $30.7 million, or over 27%.  If Logitech had properly accounted for its Revue-related inventory,

20  it would have reported operating income of approximately $112 million, far below the lowered

21  guidance of $140 million – $150 million.

22      52.    On May 27, 2011, Bardman certified that he had reviewed Logitech's Form 10-K

23  and that, among other things, (i) based on his knowledge, the Form 10-K did not contain any

24  untrue statement of a material fact or omit to state a material fact necessary to make the

25  statements made, in light of the circumstances under which such statements were made, not

26  misleading; (ii) based on his knowledge, the financial statements, and other financial information

27  included in the report, fairly presented in all material respects the financial condition, results of

1  operations and cash flows of Logitech; and (iii) he had designed internal control over financial

2  reporting, or caused such internal control over financial reporting to be designed, to provide

3  reasonable assurance regarding the reliability of financial reporting and the preparation of

4  financial statements for external purposes in accordance with GAAP.  Bardman knew, was

5  reckless in not knowing, or should have known that this certification was false.

6       53.     On May 27, 2011, pursuant to Rule 13a-14 of the Exchange Act, Bardman also

7  certified that the information contained in the Form 10-K fairly presented, in all material

8  respects, the financial condition and results of operations of the Company.  Bardman knew, was

9  reckless in not knowing, or should have known that this certification was false.

10       54.     Bardman personally profited from his misstatements and omissions by, among

11  other things, receiving a bonus that was based, in part, on Logitech's overstated operating

12  income for fiscal 2011.

13       55.     During relevant times, Logitech's stock price was artificially inflated as a result of

14  Bardman's and Wolf's misstatements and omissions concerning Revue.  Had Logitech taken the

15  Revue write-down at an earlier point, as appropriate, Logitech's operating income that it

16  announced on April 27, 2011 ($142.7 million), would have been substantially lower than the

17  revised guidance the company issued on March 31, 2011 ($140-150 million).  The market would

18  have reacted unfavorably to the news that Logitech had missed its lowered guidance.

19  ***Logitech Discloses the Material Misstatements Regarding the Financial Statements***

20       56.     On July 27, 2011, Logitech announced that it was taking a $34 million charge for

21  planned price reduction on Revue.  In this announcement, Logitech stated that it was reducing

22  the price of Revue from $249 to $99 for the second quarter of fiscal 2012.  This $34 million

23  charge also included the $10.8 million write-downs of finished goods and component inventory

24  for Revue.

25       57.     On November 14, 2014, Logitech restated its financial results for the 2011 and

26  2012 fiscal years because of errors in the timing of the Revue-related inventory write-downs.

27  Logitech acknowledged that the Company had not considered probable future pricing

SEC v. Bardman, *et al.*
Complaint

1   adjustments and discounts in those write-downs.  The LCM analysis provided to the independent

2   audit firm, and which Bardman and Wolf had discussed with the independent auditor, did not

3   address—or account for—Logitech's plan to lower the price to $199 on or before the third

4   quarter of 2012.

5        58.    In the November 2014 filing, Logitech also disclosed that it had not designed and

6   maintained effective controls to consider all relevant information and document the underlying

7   assumptions in its assessment of the valuation of finished goods, work in process, and

8   components inventory, including non-cancelable orders for such inventory, related to the Revue

9   product.

10   ***Bardman and Wolf Circumvent Internal Controls***

11        59.    Logitech had an internal control requiring that, on a quarterly basis, key Logitech

12   employees respond to an internal representation questionnaire and certify that they reviewed and

13   identified any items they believe would impact Logitech's financial statements and

14   representations to the independent auditors.  Wolf received and reviewed the responses from the

15   key employees.  Wolf knowingly circumvented this control by not resolving the VP-Global

16   Sourcing's concerns about Revue-related inventory and by not raising those concerns with the

17   Audit Committee or the independent auditor.

18        60.    Logitech had an internal control requiring that the CFO provide and update an

19   agenda list for the Audit Committee that included a financial reporting review, significant

20   judgments, and "financial management matter such as . . . results/review of external auditors'

21   Management Letter."  Bardman knowingly circumvented this control by not informing the Audit

22   Committee about:  (i) the Company's actual liability for Revue-related inventory; (ii) the facts

23   and circumstances of the Revue-related exposure; and (iii) judgments Wolf and he made, and

24   communicated to the independent auditors, about the use of excess components.  Bardman also

25   knowingly circumvented this control by providing the management representation letter that

26   contained false or misleading representations.

27

61.     Logitech had an internal control requiring that it prepare a reserve calculation quarterly for excess and obsolete (E&O) inventory.  The control required that the E&O reserve calculation be reviewed by the appropriate management to confirm that the reserve calculation was properly supported, that the amount of the reserve was reasonable, and that it was in accordance with Logitech's E&O corporate policy.  Wolf knowingly circumvented this control because, as part of the E&O process, she was provided with a summary of potential excess and obsolete inventory for contract manufacturers, which highlighted a total potential excess inventory of $19.4 million for Revue units and components that "should be reserved."  Wolf did not ensure that the amount of the E&O reserve was reasonable or in accordance with the E&O corporate policy because the reserve understated the liability for Revue-related inventory.

62.     Logitech had an internal control requiring the preparation of a formal accounting memorandum on significant accounting matters to document the facts and the proper accounting for such matters.  The control required these memoranda to be reviewed and approved by the CFO and controller, if appropriate, and the director of accounting.  Bardman and Wolf knowingly circumvented this control by not preparing, or causing the preparation of, a formal accounting memorandum that included underlying facts about the Revue-related inventory, including future pricing and discounts for Revue, the manufacturing status, and the decision to sell or dispose of excess components.

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Defendants Bardman and Wolf)**

63.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

64.     Bardman directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:  employed devices, schemes, or artifices to defraud; made untrue statements of material facts, or omitted to make the statements

SEC v. Bardman, *et al.*
Complaint

made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

65.     Wolf directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:  employed devices, schemes, or artifices to defraud; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66.     By engaging in the conduct described above, Bardman and Wolf violated, and unless restrained and enjoined will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
[15 U.S.C. § 77q(a) and 17 C.F.R. § 240.10b-5(b)]
(Defendants Bardman and Wolf)**

67.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

68.     Logitech directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:  employed devices, schemes, or artifices to defraud; made untrue statements of material facts, or omitted to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

69.     By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Bardman and Wolf knowingly or recklessly provided substantial assistance to, and thereby aided and abetted Logitech's violations of Section 10(b) of

SEC v. Bardman, *et al.*
Complaint

the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

70.     By engaging in the conduct described above, Bardman and Wolf aided and abetted Logitech's violations, and unless restrained and enjoined will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Fraud: Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(Defendants Bardman and Wolf)**

71.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

72.     Defendants Bardman and Wolf, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly,

    a.     employed a device, scheme, or artifice to defraud;

    b.     obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c.     engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon purchasers; and

73.     By engaging in the conduct described above, Bardman and Wolf violated, and unless restrained and enjoined will again violate, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## FOURTH CLAIM FOR RELIEF

**Knowingly Falsifying Books, Records, or Accounts:**
**Section 13(b)(5) of the Exchange Act**
**[15 U.S.C. § 78m(b)(5)]**
**(Defendants Bardman and Wolf)**

74.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

75.     Bardman and Wolf knowingly circumvented or knowingly failed to implement a system of internal accounting controls, or knowingly falsified books, records, or accounts that Logitech was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

76.     By knowingly engaging in the conduct described above, Bardman and Wolf violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## FIFTH CLAIM FOR RELIEF

**Falsified Books, Records, or Accounts: Rule 13b2-1 of the Exchange Act**
**[17 C.F.R. § 240.13b2-1]**
**(Defendants Bardman and Wolf)**

77.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

78.     Bardman and Wolf, directly or indirectly, falsified or caused to be falsified Logitech's books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

79.     By engaging in the conduct described above and acting knowingly, recklessly, or negligently, Bardman and Wolf violated, and unless restrained and enjoined will again violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

SEC v. Bardman, *et al.*
Complaint

## SIXTH CLAIM FOR RELIEF

**Lying to Accountants: Rule 13b2-2 of the Exchange Act**
**[17 C.F.R. § 240.13b2-2]**
**(Defendants Bardman and Wolf)**

80.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

81.     Bardman and Wolf, directly or indirectly: (a) made or caused to be made materially false or misleading statements to accountants; or (b) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to accountants in connection with (1) an audit, review, or examination of financial statements required by the Exchange Act or rules thereunder; or (2) the preparation or filing of a document or report required to be filed with the Commission.

82.     By engaging in the conduct described above and acting knowingly, recklessly, or negligently, Bardman and Wolf violated, and unless restrained and enjoined will again violate, Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## SEVENTH CLAIM FOR RELIEF

**False Certifications: Rule 13a-14 of the Exchange Act**
**[17 C.F.R. § 240.13a-14]**
**(Defendant Bardman)**

83.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

84.     By engaging in the conduct described above and acting knowingly, recklessly, or negligently, Bardman violated, and unless restrained and enjoined will again violate, Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

SEC v. Bardman, *et al.*
Complaint

## EIGHTH CLAIM FOR RELIEF

**Reporting Violations: Aiding and Abetting Logitech's Violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11 of the Exchange Act**
**[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11]**
**(Defendants Bardman and Wolf)**

85.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

86.     Logitech violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1] by filing with the Commission on May 27, 2011 a materially false and misleading annual report on Form 10-K. Logitech also violated Rule 13a-11 of the Exchange Act [17 C.F.R. § 240.13a-11] by filing with the Commission a false and misleading current report on Form 8-K, reporting false and misleading financial results, on April 27, 2011.

87.     Bardman and Wolf knowingly or recklessly provided substantial assistance to Logitech's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11].

88.     By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Bardman and Wolf aided and abetted Logitech's violations, and unless restrained and enjoined, will again aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11].

## NINTH CLAIM FOR RELIEF

**Internal Controls / Recordkeeping: Aiding and Abetting Logitech's Violations of Section 13(b)(2)(A) and (B) of the Exchange Act**
**[15 U.S.C. §§ 78m(b)(2)(A)-(B)]**
**(Defendants Bardman and Wolf)**

89.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

90.     Logitech violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by failing to make or keep books, records and accounts that in reasonable detail

accurately and fairly reflected its transactions and disposition of its assets.  Logitech further

violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to

devise and maintain a system of internal accounting controls sufficient to provide reasonable

assurances that transactions were recorded as necessary to permit preparation of financial

statements in conformity with GAAP and to maintain accountability of assets.

91.     Bardman and Wolf knowingly or recklessly provided substantial assistance to

Logitech's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C.

§§ 78m(b)(2)(A)-(B)].

92.     By engaging in the conduct described above and pursuant to Section 20(e) of the

Exchange Act [15 U.S.C. § 78t(e)], Bardman and Wolf aided and abetted Logitech's violations,

and unless enjoined will again aid and abet violations, of Sections 13(b)(2)(A) and 13(b)(2)(B)

of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)-(B)].

## TENTH CLAIM FOR RELIEF

### Failure to Reimburse: Section 304(a) of the Sarbanes-Oxley Act
### [15 U.S.C. § 7243(a)]
### (Defendant Bardman)

93.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

94.     Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)] requires the CFO

of an issuer that is required to prepare an accounting restatement due to the material

noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement

under the securities laws, to reimburse the issuer for any bonus or other incentive-based or

equity-based compensation received during the 12-month period following the first public

issuance or filing of the financial document embodying such financial reporting requirement and

any profits realized from the sale of the issuer's stock during the 12-month period.

95.     Logitech was required to prepare an accounting restatement as a result of

misconduct, which the Company filed with the Commission on November 14, 2014.

SEC v. Bardman, *et al.*
Complaint

96.     Bardman has not reimbursed Logitech for the profits realized from the sale of Logitech's stock and the bonus that he received or obtained during the statutory time periods established by section 304(a) of Sarbanes-Oxley [15 U.S.C. § 7243(a)].

97.     The Commission has not exempted Bardman, pursuant to Section 304(b) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(b)], from the application of Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)].

98.     By reason of the foregoing, Bardman has not complied with Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

A.     Permanently enjoin Bardman from (i) violating Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; (ii) violating Section 17(a) of the Securities Act; and (iii) aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)-(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11];

B.     Permanently enjoin Wolf from (i) violating Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5(a), 10b-5(c), 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2]; (ii) violating Section 17(a) of the Securities Act; and (iii) aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)-(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11];

C.     Order that Bardman and Wolf disgorge their ill-gotten gains obtained as a result of the violations alleged in this Complaint, with prejudgment interest;

D.      Order that Bardman and Wolf pay civil penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court, plus post-judgment interest;

E.      Order that Bardman, pursuant to Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)], pay the amount of any bonus and other incentive-based or equity-based compensation he received from Logitech and profits he realized from the sale of Logitech stock during the relevant statutory time period;

F.      Order that Barman and Wolf be barred from acting as officers or directors of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)]; and

G.      Grant such further relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

The Commission hereby demands a jury trial.

SEC v. Bardman, *et al.*
Complaint

| | |
|---|---|
| 1 | Date:   April 18, 2016 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |

Date:   April 18, 2016

       /s/ Paul W. Kisslinger
Paul W. Kisslinger
   New Jersey Bar No. 6511995
Kevin C. Lombardi
   District of Columbia Bar No. 474114
Patrick R. Costello
   Florida Bar Number 75034
Division of Enforcement
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel:  (202) 551-4427 (Kisslinger)
Fax: (202) 772-9772
email: *kisslingerp@sec.gov*

Of Counsel:
Matthew G. Finnegan
District of Columbia Bar No. 453942
Division of Enforcement
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202-551-4184

SEC v. Bardman, *et al.*
Complaint