UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 16-cv-02023-JST |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| v. | Re: ECF Nos. 16, 18 |
| ERIK K. BARDMAN, et al., | |
| Defendants. | |

Before the Court are Defendants' motions to dismiss.  The Court will grant the motions in part and deny them in part.

## I.  BACKGROUND

### A.  Factual Background[1]

Logitech International, S.A. is a manufacturer of computer accessories and other electronic equipment.  ECF No. 1 ¶ 1.  During the time relevant to the complaint, Defendant Erik K. Bardman was Logitech's Senior Vice President of Finance and Chief Financial Officer, and defendant Jennifer F. Wolf was its Acting Controller.  Id.

In October 2010, Logitech launched a new product called "Revue."  Id.  Revue was a television set-top device that provided internet use and video streaming through Google user interface and software.  Logitech originally priced Revue at $299, but that price was too high for the features Revue offered compared to competitive devices, and its sales suffered accordingly.  Id. at ¶ 2; ECF No. 18 at 5.  "Revue was projected to be a significant percentage of Logitech's sales revenue, and represented a new strategic direction for the company," but its "sales were 70

---

[1] For the purposes of this order, the Court accepts as true all of the well-pleaded factual allegations contained in the SEC's complaint.  ECF No. 1.

United States District Court
Northern District of California

percent lower than internal projections by the fourth quarter of the 2011 fiscal year." ECF No. 1 ¶ 1.  The product was a disappointment and led to a large financial loss for Logitech.  Id.  Plaintiff Securities and Exchange Commission ("SEC") alleges that, "[r]ather than ensure that Logitech accurately account for its problems, as they were required to do, Bardman and Wolf engaged in a scheme to materially inflate the operating income that Logitech reported to its investors in a late April 2011 earnings release, and in its annual report, or Form 10-K, filed with the Commission on May 27, 2011 for the fiscal year ended March 31, 2011."  Id.

"Prior to launching Revue . . . Logitech recorded the Revue [hundreds of thousands of] Revue units and [millions of dollars' worth of Revue] components as inventory within its financial statements.  As a result, [they] were reflected as assets from which Logitech could derive future sales."  Id. ¶ 17.  But "[b]y late November 2010, sales and finance personnel, including senior executives" were discussing reducing the price of Revue.  Id. ¶ 16.  "Bardman and Wolf were aware that Logitech would have to record a 'lower of cost or market' (LCM) charge if the value of Revue inventory were less than its market value."  Id.

In December 2010, "because of high inventory levels and weak sales," Logitech stopped manufacturing and shipping Revue and had on hand "approximately $11 million" worth of excess component parts.  Id. ¶ 18.  "[A]s early as January 2011, [Logitech] initiated a disposition plan for its Revue inventory and also decided to sell off its inventory of Revue components."  ECF No. 19, at 2.  Around January 5, 2011, "Logitech's Senior Vice-President of Operations" suggested to several executives that Logitech "'make all efforts to dispose of the components'" of Revue.  Id. The Senior Vice-President thereafter "instructed the VP of Global Sourcing/Supplier Management to 'sell all of the components we could.'"  Id.  Management at Logitech also "informed the Board of Directors" in the "first half of January 2011" that Revue was selling poorly."  Id.  Still, "[o]n January 27, 2011, Logitech issued its earnings release for the third quarter of 2011, reporting strong results, increasing its guidance for 2011 annual revenue, and affirming its guidance for annual operating income in a range of $170 million – $180 million."  ECF No. 1 ¶ 21.  "Bardman and Wolf learned about the disposition plan [for the Revue product and components] in early February and subsequently learned that Revue components were worth a fraction of what Logitech

2

had paid." Id. ¶ 22; ECF No. 19, at 2.

Around March 21, 2011, "Bardman informed the CEO that Logitech could avoid a charge by delaying or not making a decision about cutting the price of Revue." ECF No. 1 ¶ 24. Bardman wrote:

> Obviously, these numbers can move around as it [sic] relates to levels of sell through between now and any firm decisions and we also have the option of continuing to run promos on the product and take the "hit" over time.   My suggestion is that we use the Ops review discussions to make a firm decision on what we definitely want to decide between now and when we file the 10K at the end of May.  Any firm decisions we make to lower price or to definitely not make a V2 before the end of May would pull some of this impact into Q4.

Id.  The SEC alleges that "[a]s an experienced CFO, Bardman knew, was reckless in not knowing, or should have known that GAAP does not allow management to decide when it will take a charge – or to delay making a 'decision . . . to decide' to achieve an accounting result." Id. ¶ 25.  Around March 23, 2011, "a Logitech Finance employee sent Wolf a summary" highlighting "a total potential excess inventory of $19.4 million for Revue units and components that 'should be reserved.'" Id. ¶ 28.  For reasons assertedly unrelated to Revue, Logitech announced on March 31, 2011 that it had "lowered its forecast of operating income to $140-150 million, causing an immediate 16 percent drop in the company's price share." Id. ¶¶ 1, 29.  Due to that shortfall, "senior management, including Bardman and Wolf, were under substantial pressure to meet the lowered guidance," id. ¶ 1, i.e., to report income of at least $140-150 million.  "Logitech's then-CEO characterized the guidance miss as a 'disaster' and informed Bardman and other senior executives that management had lost its credibility with the market." Id. ¶ 29.

The SEC alleges that while Logitech internally kept an "exposure list" to keep track of, as relevant here, potential exposures or charges, "Bardman and Wolf did not provide the exposure list to Logitech's independent auditor [or] discuss with the auditor the potential exposure for Revue," even though that list included "millions of dollars of 'potential exposure' related to Revue" in April 2011.  Id. ¶ 30.  Bardman and Wolf were aware of the list because they "met regularly to discuss the matters on [it]." Id.  That same month, "during its fiscal year 2011 year-end financial close process, Logitech initially prepared an analysis indicating that no LCM charge was required for Revue finished goods inventory" and "failed to accurately address the value of the component

inventory." Id. ¶ 31.  "The audit team did not believe the analysis to be reasonable and spoke separately with Bardman and Wolf to discuss the importance of the assumptions in the analysis." Id.

Around "April 13, 2011, the audit team met with Bardman and Wolf.  They told Bardman and Wolf that their LCM analysis must consider management's plans for future pricing."  Id. ¶ 32. "Bardman and Wolf were aware at the time that the company was required to write down the value of its Revue inventory," and that same day, "Wolf emailed an 'exposure list' to Bardman." Id. ¶ 33.  That list "included a $2.2 million '[e]stimated LCM adjustment' for finished Revue units[,] a $10.8 million '[e]stimated inventory exposure with suppliers' for Revue component parts," and "a $1.4 million potential Revue exposure 'for second price drop."  Id.  Everything but the estimated adjustment for the finished Revue units "had not yet been discussed with or flagged for Logitech's independent auditors."  Id.

The next day, "Logitech sent a revised LCM analysis to the independent auditor" reflecting a planned price cut to $249, but not "the second planned price cut to $199, which was scheduled for the third quarter of 2012," nor "any write-down of the value of the excess component parts." Id. ¶ 34.  The SEC alleges "Bardman and Wolf were not flagging items from the exposure list for the consideration of Logitech's independent auditors even though they had created or received the list only one day earlier."  Id.  An audit team member "informed Wolf" that "Logitech was also required to evaluate and . . . record a write-down of that inventory."  Id. ¶ 35.  "Logitech's Regional Finance accountant contacted Wolf" and the VP-Global Sourcing about the excess components inventory, flagging the "'heated discussion' with the independent auditor about Revue" and "asking [the VP] to determine the number or Revue units that could be built from the component inventory."  Id. ¶ 36.

By "mid-April," Bardman and Wolf were forwarded a message from "the VP-Global Sourcing" that Logitech was "attempting to sell whatever could be sold," but "'[i]f we need to scrap [work-in-progress] and components, we should assume a recoverable value of zero.'"  Id. ¶ 27.  "On April 17, 2011, the VP-Global Sourcing, informed . . . Wolf that production of Revue had been stopped for months, and that '[a]s for components, I don't see a chance that we are ever

4

going to build them into units, this is a far[-]fetched scenario that has never been formulated." Id. ¶ 37.  He also explained that there had only been modest progress on reselling the component parts, and "'the easiest stuff to resell . . . is moving at 40-50 cts on the dollar *maximum*.  For the rest . . . we should assume 25 cts on the dollar of recovery, the rest will be a hard loss." Id. (emphasis in original).  That same day, Wolf and Bardman are alleged to have engaged in an email exchange "about the potential exposure for Revue inventory if the VP-Global Sourcing was correct." Id. ¶ 38.  While she "had no reasonable basis for assuming that the component parts would be built into finished goods" and instead had been presented with evidence to the contrary, Wolf set forth estimates that assumed Logitech would either "write-down the value of the component parts to 40-50 cents on the dollar," or "assume that the excess components would be built into finished goods." Id. ¶ 38.  Bardman reiterated that Logitech was "committed to . . . staying within our lowered range for Q4." Id. ¶ 39.

The next day, on April 18, 2011, "Wolf sent a spreadsheet" to the independent auditor calculating "a write-down of $1.1 million" for the component parts, "based on a hypothetical (and 'far[-]fetched') build-out of 79,000 additional Revue units." Id. ¶ 40.  "Wolf did not disclose that, as had been communicated to her two days earlier, Logitech had been actively attempting to sell all of the components for months, with only limited success and at prices substantially below cost.  Thus, the spreadsheet falsely indicated that the remaining $10 million in excess components did not need to be written down." Id.

Shortly afterwards, in a meeting with the audit team, the SEC alleges that Wolf made false representations to the effect that Logitech would build 79,000 more Revue units with the excess components and purchase certain additional components needed to do so, then would manufacture even more additional units.  Id. ¶ 41.  "In fact, Logitech had no plans to manufacture 79,000 additional Revue units, to purchase additional components for the manufacture of 79,000 additional units, or to manufacture any additional units beyond the 79,000 stated in the LCM analysis." Id.  Bardman and Wolf continued to confirm those same false representations to "senior members of the independent audit team." Id. ¶ 42.  The SEC alleges that "Bardman and Wolf knew, were reckless in not knowing, or should have known" that there were no plans to

manufacture additional units, that no Revue units had been shipped "since late November 2010" and production had stopped "in early December 2010." Id. ¶ 43. Moreover, there was "no timetable for resuming production or for completing the work-in-progress units," and Logitech had instead "been attempting to sell excess component parts at substantial discounts." Id. None of this information was disclosed to the auditors, "even though [Wolf and Bardman] knew, were reckless in not knowing, or should have known that failure to make such disclosure could result in rendering Logitech's financial statements materially misleading." Id.

On April 27, 2011, "Logitech issued a press release concerning its financial results for the fiscal year that ended March 31, 2011," and the SEC alleges that, as a result of Bardman's and Wolf's actions, the press release made material misrepresentations "about the Company's operating income and net income." Id. ¶ 50.

The SEC alleges that "by at least May 19, 2011, Bardman knew that Logitech's Chief Executive Officer had been evaluating whether to 'shut [Revue] down now.'" ECF No. 1 ¶ 2. By the time Logitech filed its 10-K on May 27, 2011, it "had 163,000 [unsold] units of Revue in storage in the United States," and "it had halted production of additional units in light of the poor sales performance." ECF No. 1 ¶ 2.

Also on May 27, 2011, Bardman and Wolf sent "a letter to Logitech's independent auditors" which "falsely represented that Logitech's accounting was compliant with Generally Accepted Accounting Principles, or "GAAP." Id. ¶ 4. "[U]nder GAAP, a company must value its inventory at the lower of the inventory's cost or its replacement or market value. Specifically, if the market value of a company's inventory is likely to be less than the total cost of manufacturing, shipping, bringing to market, and selling the inventory, then the company must write-down the inventory value in its financial statements to reflect that lower number." Id. ¶ 16. While the representations demanded by the auditors were meant to "ensure that the company's accounting was done in accord with accepted standards and did not mislead the investing public," Bardman "misled [the auditors] regarding the extent of Logitech's problems with Revue," and then "knew, was reckless in not knowing, or should have known," that he was certifying materially false or misleading financial statements. Id. On the Form 10-K Logitech filed with the Commission, the

6

1  company reported an operating income of $142.7 million.  Id. ¶ 49.  That number "overstated

2  operating income by $30.7 million," and a proper account of Logitech's "Revue-related inventory"

3  would have led to a "reported operating income of approximately $112 million."  Id. ¶ 51.

4  Bardman signed and certified the false form and had the requisite scienter that he was doing so.

5  Id. ¶ 52.

6         The SEC also alleges that Bardman personally profited from his misstatements and

7  omissions, that "Logitech's stock price was artificially inflated as a result of Bardman's and

8  Wolf's misstatements and omissions concerning Revue," and that Bardman and Wolf

9  circumvented various internal controls.  Id. ¶ 55, 59-62.

10        In July 2011, "Logitech announced that it was taking a $34 million charge for planned

11  price reduction on Revue," and "was reducing the price of Revue from $249 to $99 for the second

12  quarter of fiscal 2012."  Id. ¶ 56.  In November 2014, "Logitech restated its financial results for

13  the 2011 and 2012 fiscal years," acknowledging the errors in its reportings.  Id. ¶ 57.

14        **B.     Procedural Background**

15        The SEC filed its Complaint against defendants Bardman and Wolf on April 18, 2016,

16  alleging that they violated the securities laws in connection with representations surrounding

17  Logitech's operating income and the valuation of inventory concerning Revue.  Id. ¶¶ 1-4.  It

18  asserted claims for (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against

19  Bardman and Wolf, (2) aiding and abetting violations of Section 10(b) of the Exchange Act and

20  Rule 10b-5 against Bardman and Wolf, (3) fraud under Section 17(a) of the Securities Act against

21  Bardman and Wolf, (4) knowingly falsifying books, records, or accounts in violation of Section

22  13(b)(5) of the Exchange Act against Bardman and Wolf, (5) falsifying books, records, or

23  accounts in violation of Rule 13b2-1 of the Exchange Act against Bardman and Wolf, (6) lying to

24  accountants in violation of Rule 13b2-2 of the Exchange Act against Bardman and Wolf, (7) false

25  certifications in violation of Rule 13a-14 of the Exchange Act against Bardman, (8) reporting

26  violations: aiding and abetting Logitech's violations of Section 13(a) and Rules 12b-20, 13a-1, and

27  13a-11 of the Exchange Act against Bardman and Wolf, (9) internal controls/recordkeeping:

28  aiding and abetting Logitech's violations of Section 13(b)(2)(A) and (B) of the Exchange Act

United States District Court
Northern District of California

1   against Bardman and Wolf, and (10) failure to reimburse in violation of Section 304(a) of the

2   Sarbanes-Oxley Act against Bardman.  Id. ¶¶ 63-98.

3        Bardman and Wolf filed the present motions to dismiss the complaint pursuant to Rule

4   12(b)(6) for failure to state a claim upon which relief can be granted, pursuant to Rule 9(b) for

5   failure to plead fraud with particularity, and pursuant to Rule 8(a) for failure to state a claim to

6   relief that is plausible on its face.  ECF Nos. 16, 18.  The Court now considers those motions.

7        **C.   Jurisdiction**

8        This Court has jurisdiction over the SEC's claims under Sections 20 and 22 of the

9   Securities Act, 15 U.S.C. §§ 77t and 77v, and Sections 21 and 27 of the Exchange Act, 15 U.S.C.

10  §§ 78u and 78aa.

11  **II.   LEGAL STANDARD**

12       Bardman and Wolf contend that the SEC's complaint fails pursuant to Federal Rules of

13  Civil Procedure Rules 12(b)(6), 9(b), and 8(a).

14       The complaint alleges claims of fraud, which are subject to a heightened pleading standard.

15  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting

16  fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) also applies to claims that do not require a

17  showing of fraud when the nature of the allegations are "grounded in fraud."  In re Stac Elecs. Sec.

18  Litig., 89 F.3d 1399, 1404 (9th Cir. 1996).  Defendant Bardman (joined by Defendant Wolf)

19  moves under Federal Rules of Civil Procedure Rule 9(b) to dismiss Plaintiff's entire complaint on

20  the basis that it fails to allege the surrounding factual circumstances with sufficient specificity.

21  ECF No. 16.

22       To satisfy Rule 9(b), a complaint must supply "the circumstances constituting the alleged

23  fraud" with a description "'specific enough to give defendants notice of the particular

24  misconduct . . . so that they can defend against the charge and not just deny that they have done

25  anything wrong.'"  Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Bly-

26  Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)).  "To meet this standard, [a]

27  [p]laintiffs' complaint must identify the who, what, when, where, and how of the misconduct

28  charged, as well as what is false or misleading about the purportedly fraudulent statement, and

United States District Court
Northern District of California

1   why it is false." <u>Verliant Energy, Inc. v. Barry</u>, No. 14-cv-02443, 2014 WL 4579178, at *1 (N.D.

2   Cal. Oct. 6, 2014) (quoting <u>Salameh v. Tarsadia Hotel</u>, 726 F.3d 1124, 1133 (9th Cir. 2013)).

3   "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

4   Fed. R. Civ. P. 9(b).  "Plaintiff need not provide every factual detail supporting its fraud claim—

5   indeed, the SEC is not required to prove its case in the pleadings.  Rather the [complaint] must not

6   make 'conclusory allegations of fraud.'" <u>SEC v. Ficeto</u>, 839 F. Supp. 2d 1101. 1105 (C.D. Cal.

7   2011) (quoting <u>Wenger v. Lumisys, Inc.</u>, 2 F. Supp. 2d 1231, 1239 (N.D. Cal. 1998)).

8       For those claims not requiring proof of fraud, Defendants argue the SEC has failed to state

9   a claim under Federal Rules of Civil Procedure 12(b)(6) and 8(a).  While the Court accepts the

10  material facts alleged in the complaint, along with all reasonable inferences to be drawn from

11  those facts, as true, <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir. 2001), "the tenet that a court

12  must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of

13  action's elements, supported by mere conclusory statements," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678

14  (2009).  To be entitled to the presumption of truth, a complaint's allegations "must contain

15  sufficient allegations of underlying facts to give fair notice and to enable the opposing party to

16  defend itself effectively."  <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

17      Federal Rules of Civil Procedure Rule 8(a) requires "a short and plain statement of the

18  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion

19  to dismiss, regardless of whether the allegations in a complaint are also subject to Rule 9(b), a

20  plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  <u>Bell</u>

21  <u>Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>Eclectic Props. East, LLC v. Marcus &</u>

22  <u>Millichap Co.</u>, 751 F.3d 990, 995 n.5 (9th Cir. 2014).  Plausibility does not mean probability, but

23  it requires "more than a sheer possibility that a defendant has acted unlawfully."  <u>Iqbal</u>, 556 U.S.

24  at 687.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

25  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>

26  In the Ninth Circuit, "[i]f there are two alternative explanations, one advanced by defendant and

27  the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a

28  motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when

United States District Court
Northern District of California

1   defendant's plausible alternative explanation is so convincing that plaintiff's explanation is

2   *im*plausible." Starr, 652 F.3d at 1216 (emphasis in original).

3   **III.     DISCUSSION**

4        **A.   Shotgun Pleading**

5        Bardman and Wolf allege that the complaint impermissibly engages in "shotgun pleading"

6   such that they cannot understand the claims against them, and that the pleadings fail to "state[]

7   clearly how each and every defendant is alleged to have violated plaintiff's legal rights." Destfino

8   v. Reiswig, 630 F.3d 952, 958 (9th Cir. 2011); ECF No. 16 at 5–6.  The Court disagrees.

9        "Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of

10  allegations and make it difficult or impossible for defendants to make informed responses to the

11  plaintiff's allegations." Sollberger v. Wachovia Sec., LLC, No. SACV 09-0766 AG (Anx), 2010

12  WL 2674456, at *4 (C.D. Cal. June 30, 2010).  Such pleadings violate the particularity

13  requirements of Rule 9(b).  In order to avoid this pitfall, the Plaintiff must "distinguish among

14  those they sue and enlighten each defendant as to his or her alleged fraud." In re Silicon Graphics,

15  Inc. Sec. Litig., 970 F. Supp. 746, 752 (N.D. Cal. 1997) (quoting Erickson v. Kiddie, 1986 WL

16  544, *7 (N.D. Cal. 1986)).

17       Here, as in Ficeto, the SEC's complaint "clearly meets the Rule 9(b) standard.  The SEC

18  provides detailed information regarding each Defendant, his (or its) role in the fraudulent

19  transactions, the specific fraudulent acts that were allegedly performed, and how the acts

20  constitute fraud (that is, how the actions misled and manipulated the market)." Ficeto, 839 F.

21  Supp. 2d at 1105.

22       In arguing otherwise, Bardman relies on Wagner v. First Horizon Pharm. Corp., 464 F.3d

23  1273, 1279 (11th Cir. 2006), which defines shotgun pleadings as "those that incorporate every

24  antecedent allegation by reference into each subsequent claim for relief or affirmative defense."

25  Id.  But a complaint does not employ impermissible shotgun pleading just because it re-alleges by

26  reference all of the factual paragraphs preceding the claims for relief.  See, e.g., Weiland v. Palm

27  Beach Cty. Sheriff's Office, 792 F.3d 1313, 1324 (11th Cir. 2015); SEC v. Daifotis, No. 11-cv-

28  00137, 2011 U.S. Dist. LEXIS 60226, at *5 (N.D. Cal. June 6, 2011).  In fact, in Ficeto, the

United States District Court
Northern District of California

10

plaintiffs successfully did just that.  See Case No. 2:11-cv-01637-GHK-RZ, ECF No. 10.

What is impermissible, as Defendants note, is "group[ing] multiple defendants together and fail[ing] to set out which of the defendants made which of the fraudulent statements/conduct." ECF No. 16, at 6; Destfino v. Reiswig, 630 F.3d 952, 958 (9th Cir. 2011).  The second amended complaint in Destfino continued to "make 'everyone did everything' allegations," and "the court acted well within its discretion" in disallowing a fourth complaint after the plaintiffs twice amended without curing its deficiencies.  Id. at 958-59.  Here, as the Plaintiff notes, "[t]he allegations of each count are not rolled into every successive count on down the line," and "this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increase[] the burden of understanding the factual allegations underlying each count."  Weiland, 792 F.3d at 1324.  Plaintiff's complaint has laid out a course of conduct over the span of several months, involving only two defendants, with multiple sub-headings that assist in tying the allegations to the various counts below.

The Court agrees with the SEC that the complaint "appropriately sets forth the 'who, what, when, where, and how' of the fraud alleged."  ECF No. 19, at 11.  "The two defendants, Bardman and Wolf ['who'], while employed at Logitech ['where'], from March to May 2011 ['when'], together engaged in a fraudulent scheme to inflate the Company's operating income for fiscal year 2011 for the purpose of meeting its previously announced earnings guidance ['what'].  They carried out the scheme through a series of deceptive acts, which included lying to the auditors about the production plans for Revue and ultimately understating the Revue inventory reserve ['how']."  Id. at 11-12.  The factual allegations are detailed concerning which Defendant did what and who knew what when, including quotations from email exchanges and accounts of various meetings.  See e.g., ECF No. 1 ¶ 24, 35–39.  Moreover, the "headings of the numbered counts include a parenthetical identifying the Defendant (one or both) to which the count pertains."  ECF No. 19 at 12.

The Court therefore denies Bardman's and Wolf's motions to dismiss the complaint in its entirety based on "shotgun pleading" or a failure to satisfy the requirements of Rule 9(b).

**B.  Scienter**

Defendants argue that the complaint inadequately alleges that they acted with scienter.  To support its fraud claims, the SEC must generally plead that Bardman and Wolf acted knowingly or recklessly to "deceive, manipulate, or defraud" investors.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); see also Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc).  "[T]he SEC may allege scienter generally."  S.E.C. v. Berry, 580 F. Supp. 2d 911, 920 (N.D. Cal. 2008); see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")  The Court concludes that the SEC has fulfilled its pleading obligations and that Defendants have "overstate[d] the SEC's burden." Berry, 580 F. Supp. 2d at 921.

Specifically, the Court agrees with the SEC that it has sufficiently alleged facts showing Bardman and Wolf intentionally or recklessly failed to record, or caused to be recorded, a larger LCM charge for Revue in 2011 than was warranted, in order to mislead investors through misstatements.  Bardman argues that the "[c]omplaint does not plead what the relevant or applicable accounting rule was that required the recording of LCM charges, or what that rule might require."  ECF No. 16 at 13.  But the complaint alleges that GAAP requires a company to record a "lower of cost or market" (LCM) charge if the value of inventory is less than its market value," that Bardman and Wolf knew of this rule, and that they failed to write-down inventory value when they should have.  ECF No. 1 ¶ 16.  "Violations of GAAP standards can . . . provide evidence of scienter" when they are pleaded with particularity.  In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005).  "After all, books do not cook themselves." In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).  That the SEC did not specify a particular GAAP rule in its complaint is not fatal.

Bardman's dependence on U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist., No. CV-12-08193-PCT-PGR, 2015 WL 1522174, at *6 (D. Ariz. Apr. 2, 2015) is misleading.  There, scienter was inadequately pleaded not because the plaintiff failed to identify the particular accounting rule at issue, but because the plaintiff did not "point to any provision of [the rule], or any other regulation or statute . . . that prohibit[ed]" the alleged "*method of complying*" with that rule.  Id.

United States District Court
Northern District of California

1   Here, the complaint alleges both the GAAP rule that was broken, and the particulars of Bardman's

2   and Wolf's noncompliance with that rule.  ECF No. 1 ¶¶ 16, 25, 47-48.

3        Bardman next argues that, even if the SEC has alleged the relevant accounting rule, the

4   complaint fails to allege that Bardman – as a non-accountant – knew of it.  The Court disagrees, as

5   the complaint clearly alleges that Bardman and Wolf knew of the GAAP rule regarding LCM

6   charges.  ECF No. 1 ¶ 16.

7        Third, Bardman argues that the complaint does not allege facts showing Bardman was

8   aware (1) "that a larger LCM charge for Revue . . . was required due to a purported second price

9   drop to $199, or [(2)] that an excess or obsolete components LCM charge needed to be taken."

10  ECF No. 16 at 14.  Bardman alleges that the complaint fails to sufficiently plead he was aware of

11  any plan for a future price drop, or that the price drop was "probable enough to require the

12  Company to record a larger LCM charge as a result."  Id. at 15.  The allegations of the complaint

13  contradict this argument.  Not only does the complaint allege that "Logitech management"

14  informed the board of directors about a second price drop, that Wolf and Bardman's "exposure

15  list" included references to a "second price drop," and Bardman and Wolf failed to consider "the

16  second planned price cut" in their May 27, 2011, management representation letter, but it also

17  alleges how Bardman was intimately involved in price-cutting decisions.  ECF No. 1 ¶¶ 20, 24,

18  34, 48 ("Bardman informed the CEO that Logitech could avoid a charge by delaying or not

19  making a decision about cutting the price of Revue.").  The complaint clearly alleges that

20  Bardman was personally involved in the specific conduct leading to the alleged violations of

21  GAAP.

22       Bardman further argues that the complaint fails to adequately plead he knew an LCM

23  charge was required for excess or obsolete Revue component parts, ECF No. 16 at 16, relying on

24  Gonzalez v. Planned Parenthood of Los Angeles, 759 F.3d 1112, 1116 (9th Cir. 2014).  Bardman's

25  reliance is misplaced.  The Court agrees with the SEC.  In that case, the court dismissed the

26  plaintiff's third amended complaint because the allegations he made within the complaint were

27  "compellingly contradicted by a series of letters he attached to his complaint."  Id. at 1115.

28  Similar facts are not present here.

United States District Court
Northern District of California

1    Bardman argues that the "April 17, 2011 email chain shows Mr. Bardman questioning the

2  opinion of the VP-Global Sourcing" and therefore contradicts any inference that Bardman knew

3  that the VP was correct.  This argument is not persuasive.  While Bardman may not have yet been

4  willing to completely accept the VP's *opinions*, he was "forwarded [an] email chain" that clearly

5  provided him with the facts that "production of Revue had been stopped for months," a plan to

6  build the components into new units had "'never been formulated,'" Logitech had "'been working

7  since January to resell component liabilities' with only 'modest' progress," and "'the easiest stuff

8  to resell . . . [was] moving at 40-50 cts on the dollar *maximum*.'" ECF No. 1 ¶¶ 37-38.  Then,

9  when he asked Wolf about the potential exposure for Revue assuming the VP was correct, she

10  clearly did not supply any "rough estimate of the exposure if Logitech were" to write-down the

11  value of the component parts as far as the VP predicted they would need to go, or if Logitech were

12  to fail to build any more components into finished goods.  Id. ¶ 38.  While Bardman told Wolf

13  they needed to make "the right decisions," he also stressed the need to "stay[] within our lowered

14  range for Q4" of $140-150 million, i.e., the need to report income at that level.  Id. ¶¶ 29, 39.

15  Bardman's interpretations of his emails are hardly "compelling[] contradict[ions]" of the SEC's

16  claims.  The complaint's detailed account of Wolf and Bardman's discussions, plus the

17  particularly pleaded GAAP violations, are sufficient to adequately allege scienter.  See In re Daou

18  Sys., Inc., 411 F.3d at 1016.  Moreover, if anything, the complaint alleges that Wolf was even

19  more aware of Logitech's exposure regarding Revue and the Company's plans concerning that

20  product because of her interactions with auditors and various finance personnel.  ECF No. 1 ¶¶ 28,

21  30, 32-35, 37, 40-41.

22    As mentioned, in the Ninth Circuit, "Plaintiff's complaint may be dismissed only when

23  defendant's plausible alternative explanation is so convincing that plaintiff's explanation is

24  *im*plausible."  Starr, 652 F.3d at 1216 (emphasis in original).  The SEC argues that "on a motion to

25  dismiss, Defendants are not entitled to the favorable conclusions and inferences that they draw

26  from the email correspondence with the VP-Global Sourcing" concerning their lack of scienter.

27  ECF No. 19 at 18.  In this case, the SEC is correct.  Plaintiffs have offered "facts tending to

28  exclude the possibility that" the Defendants' explanations are true to the extent necessary "to

United States District Court
Northern District of California

14

1   render plaintiffs' allegations plausible within the meaning of Iqbal and Twombly," In re Century

2   Aluminum Co. Sec. Litig., 729 F.3d 1104, 1108 (9th Cir. 2013), and have sufficiently pleaded

3   scienter, Fed. R. Civ. P. 9(b).

4        Accordingly, the Court denies Bardman's and Wolf's motions to dismiss the SEC's claims

5   on the basis that the complaint inadequately pleaded scienter.

6        **C.  Materially False or Misleading Statement**

7        In their motions to dismiss, Bardman and Wolf argue that the SEC has failed to plead a

8   materially false or misleading statement with the requisite particularity.  Specifically, they argue

9   that while the complaint alleges Logitech overstated its operating income in its FY2011 financially

10   statements by $30.7 million, it is unclear "what the number represents or how it was reached."

11   ECF No. 16 at 8.  As a result, Defendants contend, the SEC has failed to plead "the [required]

12   who, what, when, where, and how of the misconduct charged, as well as what is false or

13   misleading about the purportedly fraudulent statement, and why it is false." Salameh v. Tarsadia

14   Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting Cafasso, U.S. ex rel. v. Gen. Dynamics C4

15   Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)).

16        Defendants rely on a decision from this district, Kane v. Madge Networks N.V., No. C-96-

17   20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000), in which the court stated that

18   "companies are [] obliged to value their inventory in accordance with GAAP, which requires that

19   inventory be assessed at the lower of cost or market value."  Id. at *6.  In that case, the court

20   dismissed a complaint alleging defendant's failure to properly take an LCM charge because

21   "[p]laintiffs largely avoid[ed] pleading specific figures, speaking instead of demand that had

22   'fallen dramatically,' products that were 'selling very poorly,' and inventory turnover that had

23   'deteriorated significantly.'" Id.

24        In contrast, here, the SEC has pleaded specific figures that sufficiently allege a material

25   misstatement of Logitech's inventory reserve and operating income.  The complaint alleges that

26   the total misstatement from Defendants' misconduct was $30.7 million, or the difference between

27   the $142.7 million operating income Logitech originally reported, and the $112 million restated

28   operating income.  ECF No. 1 ¶¶ 49, 51, 55.  The complaint alleges that Defendants were aware

that Logitech would have to record an LCM charge "if the value of Revue inventory were less than its market value," that when Logitech directed its contractor to stop manufacturing Revue it was left with "approximately $11 million of . . . now excess component" parts, that the Defendants kept an "exposure list" that included various figures – such as the $10.8 million estimated exposure for excess component parts that they failed to report to auditors – and that Defendants purposely reported inaccurate numbers (providing a $1.1 million write-down rather than $10.8 million to auditors). Id. ¶¶ 16, 18, 33, 40, 43, 51, 56. The complaint also alleges that unspecified amounts should have been recorded due to the various planned price cuts of the Revue product, and therefore the total misstatement was $30.7 million. Id. ¶¶ 16, 20, 34, 56, 57. The Court therefore agrees with the SEC that "the situation here is not analogous to the cases cited by Defendants." ECF No. 19, at 13. Unlike the cases cited by Defendants, here the complaint contains "allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture," and appraises Defendants "'of the approximate amount of overstatement involved.'" Gavish v. Revlon, Inc., No. 00 Civb. 7291 (SHS), 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (quoting Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518, 522 (S.D.N.Y. 1977)).

Accordingly, the Court denies Bardman's and Wolf's motions to dismiss the SEC's claim that they made a materially false or misleading statement amounting to fraud.

### D.  Section 13(b)(5) Violations

#### 1.    Wolf

Defendant Wolf argues that the complaint's internal controls claims under Section 13(b)(5) must be narrowed. The SEC's Fourth Claim charges Bardman and Wolf with violating Section 13(b)(5), which prohibits a knowing failure to implement internal controls, a knowing circumvention of controls, and a knowing falsification of books and records. 15 U.S.C. § 78m(b)(5). The SEC concedes that it is not alleging a knowing failure to implement internal controls. ECF No. 19, at 14.

Wolf does not take issue with the SEC's statement that, as to both Defendants, it has plead "their knowing understatement of the inventory reserve for Revue constituted falsification of

16

1   Logitech's financial and accounting records in violation of Section 13(b)(5)."  Id. at 15.  What

2   Wolf does argue is that the complaint has failed to adequately allege a claim of circumvention of

3   internal controls.  ECF No. 18 at 20–21.

4        Wolf ignores the allegations set forth "in paragraphs 61 and 62" of the complaint, detailing

5   how "Wolf failed to adhere to Company policy concerning Logitech's excess and obsolete

6   inventory reserves and failed to ensure that an accounting memorandum was prepared for the

7   Revue-related inventory," separate and apart from anything she failed to do as a result of the VP-

8   Global Sourcing's concerns.  ECF No. 19 at 15; ECF No. 18 at 20-21.  Moreover, the VP-Global

9   Sourcing's lack of knowledge on the reserve process does not undermine the SEC's theory that

10   Wolf remained responsible for resolving the issue and reporting a proper reserve.  ECF No. 19 at

11   15.

12        Accordingly, the Court denies Wolf's motion to narrow the SEC's internal control claims

13   under Section 13(b)(5).

14                    **2.      Bardman**

15        Bardman alleges that the SEC's Fourth Claim, under Section 13(b), fails against him

16   because it fails to plead that he had the requisite "knowledge" when circumventing internal

17   controls or falsifying any book, record, or account.  The SEC contends that it has plead the

18   requisite knowledge because the complaint alleges that "Logitech had an internal control requiring

19   the preparation of a formal accounting memorandum on significant accounting matters," and

20   Bardman and Wolf "knowingly circumvented this control by not preparing, or causing the

21   preparation of, a formal accounting memorandum that included underlying facts about the Revue-

22   related inventory, including future pricing and discounts for Revue, the manufacturing status, and

23   the decision to sell or dispose of excess components."  ECF No. 1 ¶ 62.

24        As to Bardman only, the complaint also alleges that he knowingly circumvented an

25   internal control that required "the CFO to provide and update an agenda list for the Audit

26   Committee that included a financial reporting review, significant judgments, and 'financial

27   management matter such as . . . [the] results/review of external auditors' Management letter.'"  Id.

28   ¶ 60.  The SEC alleges that Bardman knowingly circumvented this control in a number of ways.

United States District Court
Northern District of California

1    Id.

2         Accordingly, the Court denies Bardman's motion to dismiss the SEC's Section 13(b)(5)

3    claim.

4         **E.  Section 17(a) Violations Alleged Against Wolf**

5         Defendant Wolf argues in her motion to dismiss that the complaint fails to adequately

6    allege that she "obtain[ed] money or property."  15 U.S.C. § 77q (Section 17(a)(2)).  She argues

7    that the complaint does not allege that she "obtained a single dollar as a result of her alleged

8    fraud," and that it does not allege she "monetarily benefited in the form of increased salary,

9    bonuses, or by any other means."  ECF No. 18, at 19.  While the SEC cites to "opposed out-of-

10   circuit district court decisions," Daifotis, 2011 U.S. Dist. LEXIS 60226, at *27, stating that "it is

11   sufficient under Section 17(a)(2) for the SEC to allege that [the defendant] obtained money or

12   property for his employer while acting as its agent," SEC v. Stoker, 865 F. Supp. 2d 457, 463

13   (S.D.N.Y. 2012), a court in this district has previously found that "requiring the defendant's

14   receipt of money or property [is] consistent with the statutory language and thus more persuasive."

15   Daifotis, 2011 U.S. Dist. LEXIS 60226, at *27.  The Court agrees with this conclusion.

16        Therefore, defendant Wolf's motion to dismiss Claim Three as to a Section 17(a)(2)

17   primary violation against her is granted without prejudice to pleading that Wolf received money or

18   property.

19        **F.  Scheme Liability**

20        Defendant Wolf, joined by Bardman, argues in her motion to dismiss that the complaint

21   inadequately pleads scheme liability under Section 10(b) and therefore Claim One must be

22   dismissed.  ECF No. 18 at 8.  Wolf contends that the complaint makes an "impermissible attempt

23   to plead around the limitations on primary Section 10(b) liability that the Supreme Court

24   announced in Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135 (2011)," that even

25   apart from Janus, "the SEC fails to allege inherently deceptive actions beyond the core misconduct

26   of misrepresentations and omissions purportedly made in Logitech's financial statements," and

27   that "the scheme liability claims are not pled with requisite particularity."  Id.

28        First, the SEC concedes that it "does not allege that Wolf is a primary violator of Rule 10b-

United States District Court
Northern District of California

18

5(b)," but only does so "as to Bardman because he, among other things, signed Logitech's Form10-K for fiscal year 2011."  ECF No. 19 at 20, fn. 12; ECF No. 1 ¶¶ 64-65.  Yet Wolf argues that the SEC's "allegation of scheme liability is premised on misstatements that [were] not 'made' by" Wolf, and therefore the Rule 10b-5(a) and (c) claims against her must be dismissed.  Id. at 10.

"Under Rule 10b-5(a) or (c), a defendant who uses a 'device, scheme, or artifice to defraud,' or who engages in 'any act, practice, or course of business which operates or would operate as a fraud or deceit,' may be liable for securities fraud."  WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011)(quoting 17 C.F.R. § 240, Rule 10b-5).  A "Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim."  Id. (quoting Lautenberg Found. v. Madoff, 2009 WL 2928913, at *12 (D.N.J. Sept. 9, 2009)).   "A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."  Id.

"To be liable for a scheme to defraud, a defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."  Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1048 (9th Cir. 2006), vacated on other grounds by Simpson v. Homestore.com, Inc. 519 F.3d 1041, 1041-42 (9th Cir. 2008).  The complaint alleges such conduct:  Wolf's "creation of an LCM analysis based upon [a] fictitious build-out plan," and Wolf's discussions with auditor's concerning that plan were "inherently deceptive acts," ECF No. 19 at 22, created "a false appearance of fact in furtherance of the scheme."  Simpson, 452 F.3d at 1048.  Thus, as in Sells, while "the purpose of Defendants' improper actions may have been to increase [Logitech's reported operating income and to artificially inflate its stock price], which they knew would be reported to the public, their allegedly deceptive acts amount to more than making a false statement."  Id.

Accordingly, the Court denies Wolf's motion to dismiss the SEC's scheme liability claim under Rule 10b-5.

**G.  Section 304(a) Claim**

Section 304(a) of Sarbanes–Oxley provides:

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12–month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and (2) any profits realized from the sale of securities of the issuer during that 12–month period.

15 U.S.C. § 7243.  Bardman argues in his motion to dismiss that "[t]he SEC has failed to allege the following essential elements of its SOX 304 claim:

- What "first public issuance or filing with the Commission" is the basis of the SOX 304 claim, and thus what 12-month period is allegedly at issue (the SEC alleges both the May 27, 2011 Form 10-K and April 27, 2011 earnings release in the Complaint more generally as misrepresentations);

- What or whose "misconduct" the SEC claims resulted in the restatement . . . (no generally alleged facts are expressly tied to the SOX 304 claim); and

- What bonuses or stock sales are allegedly subject to reimbursement.

ECF No. 16 at 23.  Therefore, he argues, he does not know "the basis for the claim alleged against him under SOX 304 and could not . . . reimburse Logitech a particular amount that could satisfy the SEC's claim" because he does not know "the 12-month period at issue" or the amount he is supposed to reimburse.  Id.  The SEC concedes that the dates and amounts of Bardman's compensation subject to Section 304(a) are not specifically alleged, but argues that "the reasonable inference is that those transactions occurred within 12 months from when Logitech issued and filed its financial statements for fiscal year 2011," because "[n]o other set of financial statements is in issue."  ECF No. 19 at 16.  The SEC further contends that "the timing difference of approximately one month" between the filing of the two forms that may have triggered the 12-month statutory period "is of little consequence at the pleading stage where the primary issue is notice."  Id.

Even if, as it seems the SEC is arguing, the Form 8-K filed on April 28, 2011 or the Form

1    10-K filed on May 27, 2011 may be validly deemed the "trigger for the 12-month statutory

2    period," ECF No. 1 ¶¶ 50-51, the Court agrees with Bardman that the complaint should specify in

3    order to give Bardman adequate notice of the 12-month period.  This is so even if "the timing of

4    the 12-month period . . . is of no consequence," since "both sales [of Bardman's stock] occur[ed]

5    after, and within 12-months of, either filing date."  ECF No. 19 at 17.[2]

6        Accordingly, the Court grants Bardman's motion to dismiss as to the SEC's 304(a) claim,

7    with leave to amend.

8        **H.    Plaintiff's Request for Judicial Notice**

9        The SEC requests that this order take judicial notice of Bardman's public Forms 4

10   filed with the Commission, "which show that he sold Logitech stock on November 15,

11   2011 and on April 11, 2012."  ECF No. 19 at 17.  Federal Rule of Evidence 201 allows the

12   Court to take judicial noticed of a fact "not subject to reasonable dispute in that it is . . .

13   capable of accurate and ready determination by resort to sources whose accuracy cannot

14   reasonably be questioned."  Moreover, "[a] court shall take judicial notice if requested by a

15   party and supplied with the necessary information."  Id.  Matters of public record,

16   including public filings made with the SEC, may be judicially noticed.  See Emrich v.

17   Touche Ross & Co., 846 F.2d 1190, 1198 (9th Cir. 1988); see also Cement Masons &

18   Plasterers Joint Pension Trust v. Equinix, Inc., No. 11-01016 SC, 2012 WL 685344, at *5

19   n.4 (N.D. Cal. Mar. 2, 2012) (citing Dreiling v. Am. Exp. Co., 458 F.3d 942, 946 n.2 (9th

20   Cir. 2006)).

21       Accordingly, this order takes judicial notice of Bardman's public Forms 4.

22       **I.   Timeliness**

23       In his motion to dismiss, Bardman argues that the SEC's claims predicated on conduct on

24   or before April 15, 2011 are time-barred.  ECF No. 16 at 20.  Bardman notes that 28 U.S.C. §

25   _____

26   [2]Since the Court holds that the SEC has adequately pled the requisite scienter and underlying facts
     to support a securities fraud claim, it rejects Bardman's argument that Section 304(a) cannot be
27   implicated because the SEC failed to plead anyone has committed "misconduct" resulting in
     Logitech preparing an accounting restatement.  ECF No. 16 at 25; see also SEC v. Jenkins, 718 F.
28   Supp. 2d 1070, 1074 (D. Ariz. 2010) (Section 304 does not require personal misconduct by chief
     executive officer or chief financial officer).

United States District Court
Northern District of California

1    2462 establishes a five year statute of limitations for the SEC to bring any "proceeding for the

2    enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  28 U.S.C. § 2462.

3    The SEC's claims for permanent injunction and disgorgement constitute equitable relief and are

4    not typically subject to the limitations period under 28 U.S.C. § 2462.  S.E.C. v. Berry, 580 F.

5    Supp. 2d 911, 918-19 (N.D. Cal. 2008).  While civil penalties and an officer and director bar may

6    be subject to the limitations period, that analysis is properly done at summary judgment, and

7    continuing violations may subject Section 2462's limitation period to equitable tolling.  S.E.C. v.

8    Leslie, No. C 07-3444, 2010 WL 2991038, at *35 (N.D. Cal. Jul. 29, 2010).

9         The Court cannot determine whether Defendants' alleged actions constitute a continuing

10   course of unlawful action "such as to bar the limitations defense . . . at this point in the litigation."

11   S.E.C. v. Des Champs, No. 2:08-CV-01279-KJD-GWF, 2009 WL 3068258, at *2 (D. Nev. Sep.

12   21, 2009); see also S.E.C. v. Richie, No. EDCV 06-63-VAP SGLX, 2008 WL 2938678, at *11-12

13   (C.D. Cal. May 9, 2008) ("For the purposes of a motion to dismiss . . . it is immaterial that § 2462

14   might limit the civil penalties Plaintiff may be entitled to . . . It is premature for the Court to

15   address the parties' arguments concerning whether the alleged wrongful conduct outside of the

16   limitations period can be considered in assessing civil penalties.").  Rather, the statute of

17   limitations defense is more properly analyzed on a motion for summary judgment.  Id.

18        Moreover, even if the SEC had failed to plead facts to support fraudulent concealment

19   tolling the statute of limitations, the Court agrees that "the SEC's claims include actionable

20   conduct occurring *less* than five years before filing."  ECF No. 19 at 24.  Bardman specifies only

21   that the "Fourth and Fifth Claims for Relief asserting falsification of 'books, records, or accounts'

22   under Section 13(b)(5) and Rule 13b2-1 and the Ninth Claim for Relief for aiding and abetting"

23   that falsification "should be dismissed in their entirety as time-barred."  ECF No. 16 at 21.  But

24   "taking the complaint in the light most favorable to the plaintiff and drawing all reasonable

25   inferences therefrom, . . . the court cannot determine as a matter of law that plaintiff's claim[s]

26   [are] time-barred."  U.S. ex rel. Hallstrom v. Aqua Flora, Inc., No. CIV. 2-10-cv-01459-FCD-

27   EFB, 2010 WL 4054243, at *6 (E.D. Cal. Oct. 15, 2010).

28        Accordingly, at this point in the litigation, the Court denies Bardman's and Wolf's motions

United States District Court
Northern District of California

22

to dismiss any portions of the complaint as time-barred.

     **J.**    **Request to Strike Prayer for Disgorgement**

     Wolf argues in her motion to dismiss that there is no factual support in the complaint for her receiving any "ill-gotten gains obtained as a result of the violations alleged."  ECF No. 1 ¶ C. The SEC does not argue otherwise.  Instead, the SEC argues that striking the prayer for disgorgement against Wolf is "inappropriate and premature at this early stage of the proceedings." ECF No. 19 at 23.  The Court agrees that "we do not know how the evidence will develop," and therefore "it would be premature to strike this prayer for relief."  <u>Daifotis</u>, 2011 U.S. Dist. LEXIS 60226, at *39-40.

     Accordingly, the Court denies Wolf's motion to strike the complaint's prayer for disgorgement as relates to her.

**CONCLUSION**

     The Court grants Wolf's motion to dismiss Claim Three as to a Section 17(a)(2) primary violation against her.  The Court denies Wolf's motion to dismiss in all other respects.  The Court grants Bardman's motion to dismiss Claim Ten under Section 304(a) of the Sarbanes-Oxley Act. The Court denies Bardman's motion to dismiss in all other respects.  Should the SEC decide to file an amended complaint, the SEC shall do so within thirty days of the filing date of this order.

     IT IS SO ORDERED.

Dated:  October 27, 2016

                                     _____

                                       JON S. TIGAR
                               United States District Judge

United States District Court
Northern District of California

23